Window World of Baton Rouge, LLC v. Window World, Inc.; Window World of St. Louis, Inc. v. Window World, Inc., 2022 NCBC 72.

STATE OF NORTH CAROLINA

WILKES COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1

WINDOW WORLD OF BATON
ROUGE, LLC; WINDOW WORLD OF
DALLAS, LLC; WINDOW WORLD
OF TRI STATE AREA, LLC; and
JAMES W. ROLAND,

Plaintiffs,

v.

WINDOW WORLD, INC.; WINDOW
WORLD INTERNATIONAL, LLC;
and TAMMY WHITWORTH,

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO ALLOW
*IN CAMERA* TESTIMONY,
PLAINTIFFS' MOTION
REQUESTING ENTRY OF
SANCTIONS AND APPLICATION OF
THE CRIME-FRAUD EXCEPTION,
AND PLAINTIFFS' MOTION TO
COMPEL
[PUBLIC][1]**

WILKES COUNTY

15 CVS 2

WINDOW WORLD OF ST. LOUIS,
INC.; WINDOW WORLD OF
KANSAS CITY, INC.; WINDOW
WORLD OF
SPRINGFIELD/PEORIA, INC.;
JAMES T. LOMAX III; JONATHAN
GILLETTE; B&E INVESTORS,
INC.; WINDOW WORLD OF
NORTH ATLANTA, INC.; WINDOW
WORLD OF CENTRAL ALABAMA,
INC.; MICHAEL EDWARDS;
MELISSA EDWARDS; WINDOW
WORLD OF CENTRAL PA, LLC;
ANGELL P. WESNERFORD;
KENNETH R. FORD, JR.; WORLD
OF WINDOWS OF DENVER, LLC;

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain filed under seal in these actions, the Court elected to file this Order and Opinion under seal on 10 November 2022. The Court then permitted the parties an opportunity to propose redactions to the public version of this document. No redactions were proposed from Plaintiffs, Defendants, or the represented non-parties.

RICK D. ROSE; CHRISTINA M. ROSE; WINDOW WORLD OF LEXINGTON, INC.; TOMMY R. JONES; JEREMY T. SHUMATE; WINDOW WORLD OF PHOENIX LLC; JAMES BALLARD; and TONI BALLARD,

           Plaintiffs,

    and

WINDOW WORLD OF ROCKFORD, INC.; WINDOW WORLD OF JOLIET, INC.; SCOTT A. WILLIAMSON; JENNIFER L. WILLIAMSON; and BRIAN C. HOPKINS,

           Plaintiffs and
           Counterclaim
           Defendants,

v.

WINDOW WORLD, INC.; WINDOW WORLD INTERNATIONAL, LLC; and TAMMY WHITWORTH, individually and as trustee of the Tammy E. Whitworth Revocable Trust,

           Defendants and
           Counterclaim
           Plaintiffs,

v.

WINDOW WORLD OF BLOOMINGTON, INC.,

           Counterclaim
           Defendant.

1.    **THIS MATTER** is before the Court on (i) Defendants Window World, Inc. and Window World International, LLC's (together, "WW" or "Defendants") Motion to Allow *in Camera* Testimony Relating to Plaintiffs' Renewed Motion for Sanctions (the

"Motion for *Ex Parte* Testimony"), (ECF No. 889); (ii) Plaintiffs' Motion Requesting Entry of Sanctions and Application of the Crime-Fraud Exception to Privilege (the "Renewed Crime-Fraud Motion"), (ECF No. 807);[2] and (iii) Plaintiffs' Motion to Compel (the "Motion to Compel"), (ECF No. 812), (together with the Renewed Crime-Fraud Motion, the "Renewed Motions"; collectively with the Motion for *Ex Parte* Testimony and the Renewed Crime-Fraud Motion, the "Motions") in the above-captioned action. As discussed more fully below, these Motions mark the second time that Plaintiffs have asked the Court to review Defendants' assertion of privilege on the basis of the crime-fraud exception to the attorney-client privilege.[3]

2. Having considered the Motions, the related briefing, the relevant materials associated with the Motions, the supplemental briefing, and the arguments of counsel

---

[2] For ease of reference, all ECF citations in this Order are to the Court's e-docket in 15-CVS-1.

[3] For a more thorough discussion of relevant background facts and the procedural history of these cases, see *Window World of Baton Rouge, LLC v. Window World, Inc.* (*Window World 2019*), 2019 NCBC LEXIS 54, at *3–22 (N.C. Super. Ct. Aug. 16, 2019), *aff'd per curiam*, 377 N.C. 551 (2021); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 11, at *2–8 (N.C. Super. Ct. Feb. 11, 2019); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2019 NCBC LEXIS 7, at *2–7 (N.C. Super. Ct. Jan. 25, 2019); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 218, at *3–5 (N.C. Super. Ct. Dec. 19, 2018); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 102, at *3–11 (N.C. Super. Ct. Sept. 28, 2018); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 100, at *3–7 (N.C. Super. Ct. Sept. 26, 2018); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 79, at *3–4 (N.C. Super. Ct. Aug. 2, 2018); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2018 NCBC LEXIS 59, at *3–6 (N.C. Super. Ct. June 19, 2018); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *4–10 (N.C. Super. Ct. July 12, 2017); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2016 NCBC LEXIS 82, at *3–10 (N.C. Super. Ct. Oct. 25, 2016); and *Window World of St. Louis, Inc. v. Window World, Inc.*, 2015 NCBC LEXIS 79, at *2–10 (N.C. Super. Ct. Aug. 10, 2015).

at the hearing on the Renewed Motions, the Court, in the exercise of its discretion and for good cause shown, hereby rules on the Motions as set forth below.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Charles E. Coble, Robert J. King III, Benjamin R. Norman, Jeffrey E. Oleynik, Bryan Starrett, and Andrew L. Rodenbough, and Keogh Cox & Wilson, Ltd., by Richard W. Wolff, John P. Wolff, III, and Virginia J. McLin, for Plaintiffs Window World of Baton Rouge, LLC, Window World of Dallas, LLC, Window World of Tri State Area LLC, James W. Roland, Window World of St. Louis, Inc., Window World of Kansas City, Inc., Window World of Springfield/Peoria, Inc., James T. Lomax III, Jonathan Gillette, B&E Investors, Inc., Window World of North Atlanta, Inc., Window World of Central Alabama, Inc., Michael Edwards, Melissa Edwards, Window World of Central PA, LLC, Angell P. Wesnerford, Kenneth R. Ford, Jr., World of Windows of Denver, LLC, Rick D. Rose, Christina M. Rose, Window World of Rockford, Inc., Window World of Joliet, Inc., Scott A. Williamson, Jennifer L. Williamson, Brian C. Hopkins, Window World of Lexington, Inc., Tommy R. Jones, Jeremy T. Shumate, Window World of Phoenix LLC, James Ballard, and Toni Ballard.*

*Laffey, Leitner & Goode LLC, by Mark M. Leitner, Joseph S. Goode, Jessica L. Farley, Sarah E. Thomas Pagels, and John W. Halpin,[4] and Manning, Fulton & Skinner, P.A., by Michael T. Medford, Judson A. Welborn, Natalie M. Rice, and Jessica B. Vickers, and Fox Rothschild LLP, by Matthew N. Leerberg, Kip D. Nelson, Troy D. Shelton, and Elizabeth S. Hedrick,[5] for Defendants Window World, Inc. and Window World International, LLC.*

*Bell, Davis & Pitt, P.A., by Andrew A. Freeman and Alan M. Ruley, for Defendant Tammy Whitworth.*

---

[4] On 20 June 2022, the Court granted the motion of Joseph S. Goode, Mark M. Leitner, Sarah T. Pagels, Jessica L. Farley, and John W. Halpin of the law firm of Laffey, Leitner & Goode, LLC to withdraw as counsel for Defendants in this action. (*See* Order Mot. Withdraw, ECF No. 882.)

[5] Kip D. Nelson of Fox Rothschild LLP filed a Notice of Appearance on 17 May 2022, (ECF No. 864), and Troy D. Shelton and Elizabeth S. Hedrick, also of Fox Rothschild LLP, filed Notices of Appearance on 28 June 2022, (ECF Nos. 884–85).

*Wilson Ratledge, PLLC, by Reginald B. Gillespie, Jr., for non-parties Anna Elizabeth Vannoy, John G. Vannoy, and Vannoy, Colvard, Triplett & Vannoy, P.L.L.C.*

Bledsoe, Chief Judge.

## I.

## FINDINGS OF FACT[6]

3.    Defendants market and sell windows, doors, and siding for residential use. Plaintiffs in these actions are franchisees and franchisee owners who purchase such materials and install the products using the "Window World" name.

4.    Plaintiffs allege in their Third Amended Complaint, *inter alia*, that: (i) WW fraudulently concealed that it was a franchise[7] under applicable law and also concealed other related business information that Plaintiffs were entitled to receive

---

[6] Any Findings of Fact that are more appropriately deemed Conclusions of Law are incorporated by reference into the Court's Conclusions of Law.

[7] As defined in 16 C.F.R. § 436.1(h),

> [f]ranchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:
>
> (1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;
>
> (2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and
>
> (3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

under the Federal Trade Commission's Franchise Disclosure Rule;[8] (ii) WW fraudulently concealed that it offered a third level of more favorable wholesale pricing to other store owners while knowingly misrepresenting pricing and rebate information to Plaintiffs by falsely representing that the pricing they received was WW's most favorable;[9] and (iii) previous licensing agreements signed by Plaintiffs should be deemed null and void because "the cause and/or object of the agreement, as intended by WW, was illegal[ ]" or, in the alternative, because those agreements were induced by WW's fraud.[10]

5. On 21 May 2018, Plaintiffs filed a Motion to Compel and Motion for Sanctions for Defendants' Wrongful Assertions of Privilege (the "2018 Motion to Compel")[11] and a Motion for Finding of Waiver of the Attorney-Client Privilege and Work-Product Doctrine as to Certain Topics (the "2018 Crime-Fraud Motion")[12] (together, the "2018 Motions"). In those motions, Plaintiffs first sought to require the disclosure of franchise-related documents that WW withheld from production as protected by attorney-client privilege through application of the privilege's crime-

---

[8] (Third Am. Compl. ¶¶ 59, 62, 65–66 [hereinafter "TAC"], ECF Nos. 252 (sealed), 257 (redacted).) The requirements of the Franchise Disclosure Rule are listed in 16 C.F.R. § 436.5. A franchisor's obligation to disclose this information to a franchisee in a Franchise Disclosure Document ("FDD") is codified at 16 C.F.R. § 436.2.

[9] (TAC ¶¶ 262–66.)

[10] (TAC ¶¶ 223–24, 226–27.)

[11] (Pls.' Mot. Compel and Mot. Sanctions Defs.' Wrongful Assertions Privilege [hereinafter "2018 Mot. Compel"], ECF No. 448.)

[12] (Pls.' Mot. Finding Waiver Att'y-Client Privilege and Work-Product Doctrine as to Certain Topics [hereinafter "2018 Crime-Fraud Mot."], ECF No. 446.)

fraud exception.[13] Plaintiffs argued that WW, through its in-house counsel, Anna Elizabeth Vannoy ("Beth Vannoy" or "Ms. Vannoy"), perpetrated a fraud by pressuring Plaintiffs to sign licensing agreements specifically disclaiming a franchise relationship with WW[14] and failing to make required disclosures under applicable franchise law despite her and WW's knowledge, at least as of May 2010, that WW was in a franchise relationship with Plaintiffs and other store owners.[15] Plaintiffs also challenged WW's assertions of privilege over numerous documents that WW had produced to Plaintiffs and subsequently "clawed back" as privileged.[16]

6. With the consent of the parties, the Court appointed a special discovery master (the "Special Master") to conduct an *in camera* review of the challenged

---

[13] (*See* Pls.' Br. Supp. Mot. Requesting Finding Waiver of Att'y-Client Privilege and Work-Product Doctrine 10–12 [hereinafter "Pls.' 2018 Crime-Fraud Br."], ECF Nos. 447 (sealed), 462 (redacted).)

[14] For example, the licensing agreement provided to Window World of North Atlanta, Inc. expressly stated:

> Nothing in this Licensing Agreement shall be deemed to create any type of partnership, employment, agency, franchise, or other business relationship other than LICENSOR and LICENSEE. The parties acknowledge and agree that, to the extent the state in which the LICENSEE is granted its license has enacted statutes, codes, or regulations which govern franchises, the LICENSEE and LICENSOR are not subject to such laws and regulations and the LICENSOR shall not be required to provide any disclosures to LICENSEE other than those previously made to LICENSEE or made herein.

(Pls.' Br. Supp. Mot. Requesting Entry Sanctions and Appl. Crime-Fraud Exception to Privilege Ex. 56-1, at ¶ 17, ECF No. 808.56.) Other Plaintiffs and store owners executed licensing agreements containing the same or substantially similar language. (*See, e.g.*, Pls.' Br. Supp. Mot. Requesting Entry Sanctions and Appl. Crime-Fraud Exception to Privilege Exs. 56-1 to -21, ECF No. 808.56.)

[15] (*See* Pls.' 2018 Crime-Fraud Br. 2).

[16] (Pls.' 2018 Crime-Fraud Br. 12–13.)

materials and a sample of additional documents WW had withheld on the basis of privilege.[17] After careful review of the Special Master's *in camera* report and the 2018 Motions, the Court entered an order resolving the 2018 Motions (the "August 2019 Order"). *See Window World 2019*, 2019 NCBC LEXIS 54.

7. Among other rulings in the August 2019 Order, the Court rejected Plaintiffs' crime-fraud challenge based on the evidence of record at that time. The Court concluded that while " there exist[ed] substantial evidence tending to show that WW was operating a franchise system at the time Ms. Vannoy became WW's in-house counsel in June 2010 and thus prior to its purported 'conversion' in October 2011[,]"[18] *id.* at *49–50, the Court was not prepared to conclude that Plaintiffs had established by a preponderance of the evidence "that WW and Ms. Vannoy knew that WW was subject to state and federal franchise laws no later than May 2010[,]" *id.* at *56.

8. In that same order, however, the Court required that (i) WW make available for use by any party for purposes of the litigation the 280 documents WW had voluntarily produced and then "clawed-back" in 2018 because WW had waived its attorney-client privilege and work-product objections to their production; (ii) WW produce forty-two documents included within a sample set of documents identified as privileged on WW's privilege logs because they were not protected by privilege or

---

[17] (*See* Am. Order *in Camera* Review 2–3, ECF No. 594.)

[18] The Court noted that it found particularly persuasive the letter from Dana Deem, WW's President in October 2011, acknowledging that WW had been operating as a franchisor in violation of federal law and the laws of certain states, as well as WW and Beth Vannoy's failure to offer evidence that WW changed its business practices at any point between May 2010 and October 2011. *Window World 2019*, 2019 NCBC LEXIS 54, at *49–50.

work-product immunity; (iii) WW re-review all documents WW had withheld on privilege or work-product grounds and produce those which were not properly withheld under the standards set forth in the August 2019 Order; and (iv) WW revise all privilege logs to contain adequate and accurate document descriptions consistent with the Court's guidelines in the August 2019 Order. *See id.* at \*26–35, \*92–93, \*103–04.

9. WW appealed the Court's rulings[19] and, nearly two years later, on 11 June 2021, the Supreme Court of North Carolina affirmed *per curiam* the Court's August 19 Order. *Window World of Baton Rouge, LLC v. Window World, Inc.*, 377 N.C. 551, 2021-NCSC-70, ¶ 1. The mandate following the Supreme Court's ruling was issued on 1 July 2021 pursuant to Rule 32(b) of the North Carolina Rules of Appellate Procedure, and the above cases were then returned to this Court for further proceedings.

10. On 21 July 2021, the Court entered a Fifth Amended Case Management Order (the "Fifth CMO") to implement the Court's rulings in the August 2019 Order, establish a dispute resolution process for disagreements arising from implementation of the Court's rulings in the August 2019 Order, and set a timetable for all remaining pretrial case activity.[20]

11. Consistent with the Fifth CMO, on 7 January 2022, the parties filed a Joint Report outlining numerous unresolved issues arising from the implementation of the

---

[19] (Notice of Appeal, ECF No. 728.)

[20] (*See* Fifth Amendment Case Management Order, ECF No. 797.)

Court's rulings in the August 2019 Order.[21] The Court thereafter set a motion, briefing, and hearing schedule to consider these unresolved matters.[22]

12. Plaintiffs timely filed the Renewed Motions on 31 January 2022. After full briefing, the Court held a hearing on the Renewed Motions on 21 April 2022 (the "Hearing"), at which all parties and non-parties Beth Vannoy, John G. Vannoy ("Jay Vannoy"), and Vannoy, Colvard, Triplett & Vannoy, PLLC ("Vannoy Colvard") were represented by counsel.

13. Plaintiffs contend through the Renewed Crime-Fraud Motion that new evidence produced by WW after remand requires both that (i) the crime-fraud exception be applied to effect a waiver of WW's assertion of privilege over WW's communications and documents related to franchise law generated prior to 1 November 2011 and (ii) the severest sanctions be imposed for what Plaintiffs argue are WW's knowing and repeated misrepresentations to Plaintiffs and the Court to cover up the fact that WW knew it was operating a franchise system when it solicited Plaintiffs and others to sign licensing agreements disclaiming a franchise relationship.[23]

14. Through the Motion to Compel, Plaintiffs ask the Court to conduct an *in camera* review and order the production of fifty-two documents that Plaintiffs allege

---

[21] (*See* Joint Report, ECF No. 801.)

[22] (Scheduling Order and Notice Hr'g, ECF No. 804.)

[23] (Pls.' Mot. Requesting Entry Sanctions and Appl. Crime-Fraud Exception to Privilege 2–4 [hereinafter "Pls.' Renewed Crime-Fraud Mot."], ECF No. 807.)

WW has wrongfully withheld or redacted on the basis of privilege.[24]  By order dated 26 April 2022, the Court ordered an *in camera* review of all documents at issue on the Motion to Compel except for five billing statements from WW's outside counsel, Vannoy Colvard (the "Billing Records").  *See Window World of Baton Rouge, LLC v. Window World, Inc.*, 2022 NCBC LEXIS 35, at *6–8 (N.C. Super. Ct. Apr. 26, 2022). As to the Billing Records, the Court ordered briefing concerning whether the Court should enforce Plaintiffs' agreement with Vannoy Colvard permitting redaction of all billing descriptions from the Billing Records (the "Agreement") as a condition of their production.  *Id.*  By order dated 13 June 2022, the Court concluded that it would not enforce the Agreement in the circumstances and ordered WW and Vannoy Colvard to produce the Billing Records to Plaintiffs, redacted only for privilege, and to tender an associated privilege log identifying the grounds for their privilege claims.  *See Window World of Baton Rouge, LLC v. Window World, Inc.*, 2022 NCBC LEXIS 58, at *5, *7–8 (N.C. Super. Ct. June 13, 2022).

15.    Vannoy Colvard produced the Billing Records to Plaintiffs in two batches, the first on 17 June 2022  (the "June 17 Production") and the second on 24 June 2022.[25]  Plaintiffs subsequently  challenged WW's assertion of privilege as to certain

---

[24] (*See* Pls.' Br. Supp. Mot. Compel 10, 19, 22, 25 [hereinafter "Pls.' Compel Br."], ECF Nos. 813 (sealed), 821 (redacted).)  These documents are identified by Exhibit A to Plaintiffs' Motion to Compel.   (ECF No. 812.1.)  Prior to the Hearing on the Renewed Motions, WW released its privilege claim as to WW00170946, (*see* Defs.' Br. Opp'n Pls.' Mot. Compel 11 n.4 [hereinafter "WW Compel Resp."], ECF Nos. 827 (sealed), 828 (redacted)), so while the Motion to Compel lists fifty-three documents, there are only fifty-two documents in dispute.

[25] Vannoy Colvard's June 17 production included Exhibit 22 to Plaintiffs' Motion to Compel, (ECF No. 813.23), which is also identified as VCLAW0001623 on Exhibit A to Plaintiffs' Motion to Compel.  The June 24 production included Exhibits 23–26 to Plaintiffs' Motion to

billing descriptions in the June 17 Production and sought the Court's *in camera* review.[26] The Court granted Plaintiffs' request and ordered an *in camera* review of these documents on 27 July 2022.[27] The documents were subsequently made available to the Court.

16. For its part, WW has also sought the Court's *in camera* review in connection with the pending Renewed Motions. On 6 July 2022, WW filed a Motion for *Ex Parte* Testimony, offering the *ex parte* testimony of Ritchie Taylor ("Taylor"), WW's outside franchise attorney at Manning, Fulton & Skinner, P.A. ("Manning Fulton"), one of the firms representing Defendants in this action, to "explain his contemporaneous understanding of [WW]'s status and his statements to the regulators[.]"[28] Plaintiffs timely filed their opposition to the motion on 26 July 2022.[29] WW filed its reply on 5 August 2022 (the "*Ex Parte* Reply").[30]

---

Compel, (ECF Nos. 813.24–.27), which were also identified as VCLAW0001791, VCLAW0001863, VCLAW0001864, and VCLAW0001867 on Exhibit A to Plaintiffs' Motion to Compel.

[26] (*See* Pls.' Statement Regarding Privilege Claims Vannoy Colvard Billing Rs. 4–9, ECF Nos. 888 (sealed), 894 (redacted).) Citations to the page numbers of this document refer to the electronic PDF page numbers as there are no page numbers on the pages themselves.

[27] (Order *in Camera* Review Vannoy Colvard Billing Rs. ¶ 10, ECF No. 904.)

[28] (*See* Defs.' Mot. Allow *in Camera* Test. Relating to Pls.' Renewed Crime-Fraud Mot. 1–2 [hereinafter "WW Mot. *Ex Parte* Test."], ECF No. 889.)

[29] (Pls.' Br. Resp. Defs.' Mot. Allow *Ex Parte, in Camera* Test. Opp'n to Pls.' Sanctions Mot. [hereinafter "Pls.' *Ex Parte* Test. Resp."], ECF Nos. 903 (sealed), 908 (redacted).)

[30] (Defs.' Reply Supp. WW Mot. Allow *in Camera* Test. Relating to Pls.' Renewed Mot. Sanctions [hereinafter "WW *Ex Parte* Test. Reply"], ECF No. 905.)

17. In a significant change of position, WW represented in its *Ex Parte* Reply that it relinquished its claims of privilege "over all the pre-Manning Fulton franchise-related documents subject to the current [M]otion to [C]ompel, including the redacted portions of the Vannoy Colvard billing records" and agreed to produce those documents to Plaintiffs.[31] The affected documents included those identified in the "Privilege Claims related to Pre-October 2011 Franchise Issues" section of Exhibit A to Plaintiffs' Motion to Compel (excluding WW00171293 and WW00171709) and all Billing Records containing franchise-related redactions that were generated prior to 30 June 2011 (together, the "Waiver Documents").[32]

18. The Court subsequently convened a status conference on 10 August 2022 to discuss WW's privilege waiver and, that same day, ordered WW to produce the Waiver Documents and all affected parties to submit supplemental briefing on the effect of the production of the Waiver Documents on the Renewed Motions.[33] Plaintiffs, Defendants, and non-parties Beth Vannoy, Jay Vannoy, and Vannoy Colvard timely submitted supplemental briefs in accordance with the Court's order.[34] All briefing on the Motions was completed on 6 September 2022.

---

[31] (WW *Ex Parte* Test. Reply 11.)

[32] (*See* Scheduling Order ¶ 3 n.2, ECF No. 907; Pls.' Mot. Compel Ex. A.)

[33] (*See* Scheduling Order ¶¶ 4–5.)

[34] (*See* Pls.' Br. Concerning Newly Produced Docs. [hereinafter "Pls.' Waiver Docs. Br."], ECF Nos. 912 (sealed), 918 (redacted); Defs.' Resp. Concerning Newly Produced Docs. [hereinafter "WW Waiver Docs. Resp."], ECF No. 913; Beth Vannoy's and Jay Vannoy's Resp. Pls.' Waiver Docs. Br. [hereinafter "Vannoy Waiver Docs. Resp."], ECF No. 914; Pls.' Reply 8/29/22 Resp. Brs. WW and Vannoys Concerning Newly Produced Docs. [hereinafter "Pls.' Waiver Docs. Reply"], ECF No. 917.)

19.     The Motions are now ripe for resolution.

II.

CONCLUSIONS OF LAW[35]

A.     The Attorney-Client Privilege and Work-Product Doctrine

20.     "The attorney-client privilege is well-grounded in the jurisprudence of this State." *In re Investigation of the Death of Miller*, 357 N.C. 316, 328 (2003). To determine whether a communication is protected by the attorney-client privilege, a court must apply a five-factor test:

> (1) the relation of attorney and client existed at the time the communication was made, (2) the communication was made in confidence, (3) the communication relates to a matter about which the attorney is being professionally consulted, (4) the communication was made in the course of giving or seeking legal advice for a proper purpose although litigation need not be contemplated and (5) the client has not waived the privilege.

*Friday Invs., LLC v. Bally Total Fitness of the Mid-Atl., Inc.*, 370 N.C. 235, 240 (2017) (quoting *State v. Murvin*, 304 N.C. 523, 531 (1981)).

21.     "The burden is always on the party asserting the privilege to demonstrate each of its essential elements." *Miller*, 357 N.C. at 336. However, "[t]he trial court is best suited to determine, through a fact-sensitive inquiry, whether the attorney-client privilege applies to a specific communication." *Friday Invs., LLC*, 370 N.C. at 240 (emphasis omitted) (quoting *Raymond v. N.C. Police Benevolent Ass'n*, 365 N.C. 94, 100 (2011)).

---

[35] Any Conclusions of Law that are more appropriately deemed Findings of Fact are incorporated by reference into the Court's Findings of Fact.

22. "In contrast to the robust protection bestowed by the attorney-client privilege, the work[-]product doctrine provides limited immunity from discovery for documents and other tangible things prepared 'in anticipation of litigation.'" *Ford v. Jurgens* (*Ford I*), 2021 NCBC LEXIS 89, at *8 (N.C. Super. Ct. Oct. 5, 2021) (quoting N.C. R. Civ. P. 26(b)(3)); *see also Willis v. Duke Power Co.*, 291 N.C. 19, 35 (1976) ("Although not a privilege, the exception is a qualified immunity and extends to all materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's consultant, surety, indemnitor, insurer, or agent." (cleaned up)).

23. "Materials prepared in the ordinary course of business are not protected, nor does the protection extend to facts known by any party." *Willis*, 291 N.C. at 35 (emphasis omitted). In considering whether materials are made in anticipation of litigation or in the ordinary course of business, courts will consider

> whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

*Sessions v. Sloane*, 248 N.C. App. 370, 383 (2016) (quoting *Cook v. Wake Cnty. Hosp. Sys., Inc.*, 125 N.C. App. 618, 624 (1997)).

24. "As is the case with attorney-client privilege, '[t]he party asserting work product protection bears the burden of proof of establishing entitlement to it.'" *Buckley LLP v. Series 1 of Oxford Ins. Co. NC LLC*, 2020 NCBC LEXIS 136, at *27

(N.C. Super. Ct. Nov. 9, 2020) (quoting *Suggs v. Whitaker*, 152 F.R.D. 501, 505 (M.D.N.C. 1993)), *aff'd per curiam*, 382 N.C. 55, 2022-NCSC-94, ¶ 1.

25. The Court applies these general principles in its consideration of the Motions.

B.     <u>Defendants' Motion for *Ex Parte* Testimony</u>

26. As a preliminary matter, the Court considers whether WW may offer *ex parte*, *in camera* testimony from Taylor, an attorney at Manning Fulton who assisted WW with franchise law matters beginning on 30 June 2011, in further opposition to the Renewed Crime-Fraud Motion. WW argues that Taylor should be heard *ex parte* and *in camera* to respond to Plaintiffs' contention that Taylor's statements in emails to state regulators in 2011 established that WW had concluded that it was a franchise system before it hired Beth Vannoy as its in-house counsel in June 2010.[36] Plaintiffs oppose the Motion for *Ex Parte* Testimony, contending that WW's request is "unprecedented, untimely, and manifestly unfair[.]"[37] The Court agrees with Plaintiffs.

27. Defendants' Motion for *Ex Parte* Testimony effectively seeks to supplement the record on the pending Renewed Motions almost three months after they filed their responses and the Motions were heard. The Business Court Rules provide that "[a]ll materials, including affidavits, on which a motion or brief relies must be filed with

---

[36] (*See* Defs.' Br. Supp. WW Mot. *Ex Parte* Test. 5–6 [hereinafter "WW *Ex Parte* Test. Br."], ECF No. 890.)

[37] (Pls.' *Ex Parte* Test. Resp. 8.)

the motion or brief[,]" BCR 7.5, and that "[a]bsent a showing of excusable neglect or as otherwise ordered by the Court, the failure to timely file a brief or supporting material waives a party's right to file the brief or supporting material[,]" BCR 7.11.

28.     Here, Defendants have not offered a persuasive reason for their delay and simply suggest that it took several months to decide upon this strategic course.[38] Such is hardly excusable neglect.    Particularly given the extraordinary relief requested—*ex parte, in camera* testimony concerning a WW lawyer's privileged communications with his client regarding substantive matters at the heart of the parties' dispute—and the dearth of case law permitting such a course of action where the propriety of a lawyer's conduct is not at issue, the Court concludes, in the exercise of its discretion, that the Motion for *Ex Parte* Testimony should be denied.[39]

C.     Renewed Crime-Fraud Motion

1.     Application of the Crime-Fraud Exception

29.     As noted above, this is the second time that Plaintiffs have sought the disclosure of WW's privileged communications through the crime-fraud exception. Plaintiffs contend that, regardless of the merits of their first motion, Defendants' post-appeal production has brought to light new information that Plaintiffs argue establishes that the crime-fraud exception applies to require Defendants to disclose

---

[38] (*See* WW *Ex Parte* Test. Br. 4–5; WW *Ex Parte* Test. Reply 6–7.)

[39] Defendants also filed the Affidavit of Sandra Clark in Support of Defendants' Brief in Opposition to Plaintiffs' Motion to Compel, (ECF No. 856), on 19 April 2022, over a month after filing their response to the Motion to Compel and mere days before the April 21 Hearing. WW again has not shown excusable neglect for its delay, and therefore the Court also declines, in the exercise of its discretion, to consider this affidavit.

otherwise privileged communications "relating to franchise law dating prior to November 1, 2011."[40]

30. "The [attorney-client] privilege is intended to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Dickson v. Rucho,* 366 N.C. 332, 340 (2013) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). The privilege is not absolute, however, and "[w]hen certain extraordinary circumstances are present, the need for disclosure of attorney-client communications will trump the confidential nature of the privilege." *Miller,* 357 N.C. at 335. In particular, the "privilege cannot serve as a shield for fraud or as a tool to aid in the commission of future criminal activities; if a communication is not made in the course of seeking or giving legal advice for a proper purpose, it is not protected." *Id.* (cleaned up). In that regard, "the crime-fraud exception applies only when the client has engaged the services of a lawyer 'in furtherance of future illegal conduct.'" *Ford I*, 2021 NCBC LEXIS 89, at *21 (emphasis omitted) (quoting *United States v. Zolin*, 491 U.S. 554, 556 (1989)).

31. As Judge Earp of this Court has helpfully summarized:

> [T]he party invoking the crime-fraud exception must make a *prima facie* showing that otherwise privileged communications fall within the exception. The invoking party must show that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud. Prong one of this test is satisfied by a *prima facie* showing of evidence that, if

[40] (Pls.' Br. Supp. Renewed Crime-Fraud Mot. 3–5 [hereinafter "Pls.' Crime-Fraud Br."], ECF Nos. 808 (sealed), 822 (redacted).)

believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed. Prong two may be satisfied with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity.

Given the importance of the attorney-client privilege to North Carolina's jurisprudence and the resulting scrutiny that should be applied to any exceptions, parties advancing the crime-fraud exception must prove the *prima facie* case by a preponderance of the evidence.

*Id.* at *20–21 (cleaned up).

32. "While such a [*prima facie*] showing may justify a finding in favor of the offering party, it does not necessarily compel such a finding." *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976).[41] At the same time, "absolute proof of fraud or crime" is not required. *United States v. Under Seal (In re Grand Jury Proceedings)*, 33 F.3d 342, 352 (4th Cir. 1994). "In applying the crime-fraud exception, 'it is the client's knowledge and intentions that are of paramount concern because the client is the holder of the privilege.' " *Window World 2019*, 2019 NCBC LEXIS 54, at *47 (quoting *United States v. Under Seal (In re Grand Jury Proceedings #5)*, 401 F.3d 247, 251 (2005)).

33. Plaintiffs contend in their Renewed Crime-Fraud Motion that WW's newly produced documents, together with the evidence Plaintiffs previously submitted in support of their 2018 Crime-Fraud Motion, establishes by a preponderance of the evidence that WW and Beth Vannoy knowingly perpetrated a fraud against Plaintiffs

---

[41] Our Supreme Court looks to federal case law for guidance in considering exceptions to the attorney-client privilege. *See, e.g.*, *Miller*, 357 N.C. at 330 ("Significantly, our General Assembly has not seen fit to enact . . . statutory provisions for the attorney-client privilege, and we must look solely to the common law for its proper application.").

by inducing them to sign licensing agreements that disclaimed a franchise relationship with WW when WW and Beth Vannoy knew WW's disclaimer was false.[42] As a result, Plaintiffs argue that the crime-fraud exception should be applied to effect a waiver of privilege concerning all of WW's communications regarding franchise law matters prior to 1 November 2011.[43]

34. In opposition, WW argues that Plaintiffs' Renewed Crime-Fraud Motion improperly seeks reconsideration of issues previously resolved by the August 2019 Order.[44] WW and Beth Vannoy additionally contend that Plaintiffs misunderstand and mischaracterize the evidence and argue that the factual findings required to establish crime-fraud here are more appropriately left to a jury at a trial on the merits.[45]

35. At the status conference held on 10 August 2022, the parties acknowledged that, in light of WW's belated waiver of privilege on 5 August, the Renewed Crime-Fraud Motion was rendered moot with respect to all WW communications about franchise law matters before 30 June 2011. Nevertheless, Plaintiffs continue to seek a privilege waiver as to all WW franchise-related communications made between 30

---

[42] (*See* Pls.' Crime-Fraud Br. 3–5.)

[43] (Pls.' Crime-Fraud Br. 4–5.)

[44] (*See* Defs.' Br. Opp'n Pls.' Renewed Crime-Fraud Mot. 22–24 [hereinafter "WW Crime-Fraud Resp."], ECF No. 832.)

[45] (WW Crime-Fraud Resp. 2–3; Resp. Beth Vannoy Pls.' Renewed Crime-Fraud Mot. 4, 34–36 [hereinafter "Vannoy Crime-Fraud Resp."], ECF No. 836.)

June and 1 November 2011 that WW has withheld on privilege grounds.[46] The Court will therefore confine its analysis to the application of the crime-fraud exception to materials generated after 30 June 2011.

36. The Court first finds WW's suggestion that Plaintiffs' Renewed Crime-Fraud Motion improperly seeks reconsideration of the August 2019 Order without merit.[47] Not only did the Court's August 2019 Order invite a further consideration of the crime-fraud exception upon the presentation of newly produced evidence, *see Window World 2019*, 2019 NCBC LEXIS 54, at \*57 n.40, but the record is clear that Plaintiffs rely, in substantial part, upon evidence first produced in this action after the Supreme Court affirmed the August 2019 Order.

37. Next, the Court considers whether the crime-fraud exception applies to WW's post-30 June 2011 communications. Significantly for present purposes, North Carolina courts apply the crime-fraud exception only where "the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *Ford I*, 2021 NCBC LEXIS 89, at \*20 (citation omitted); *see also, e.g.*, *United States v. Under Seal (In re Grand Jury Investigation)*, 352 F. App'x 805, 810 (4th Cir. 2009) (concluding that documents that "were in furtherance of the alleged scheme" bore "the requisite close relationship"); *United States v. Moazzeni*, 906 F. Supp. 2d 505, 515 (E.D. Va. 2012) (holding that communications did not bear a close relationship when the possibility of a pre-

---

[46] (*See* Pls.' Waiver Docs. Br. 8–9; Pls.' Waiver Docs. Reply 5.)

[47] (*See* WW Crime-Fraud Resp. 22–24.)

existing scheme was too speculative and the advice communicated did not have any connection to the scheme); *Peterson v. Fairfax Hosp. Sys., Inc.*, 37 Va. Cir. 535, 538 (Cir. Ct. 1995) (determining that any materials created after the alleged misconduct were not subject to the crime-fraud exception).

38.    Plaintiffs, however, have not tendered evidence that Beth Vannoy solicited Plaintiffs to enter into licensing agreements with WW after Manning Fulton was hired as franchise counsel on 30 June 2011.  While Plaintiffs argue that WW's alleged fraud continued until WW disclosed that it was violating franchise laws, Plaintiffs' only evidence of solicitation by WW after Manning Fulton was retained is an email dated 2 August 2011 from Bonnie Bentley, the assistant to the WW president at the time, to the Rose Plaintiffs inquiring about licensing agreements.[48]  Nothing in the assistant's email suggests Beth Vannoy's involvement in any way, and Plaintiffs have not offered evidence to tie Beth Vannoy to this post-June 30 communication.  Without a causal nexus, the Court has no basis to effect a privilege waiver to WW's franchise-related matters after 30 June 2011.

39.    Accordingly, the Court shall deny the Renewed Crime-Fraud Motion as moot as to WW's franchise-related communications before 30 June 2011 and shall otherwise deny the motion as to WW's franchise-related communications thereafter.

### 2.    Request for Entry of Sanctions

40.    The Court next considers Plaintiffs' request for sanctions.

---

[48] (Pls.' Crime-Fraud Br. Ex. 58, ECF No. 808.58.)

41. "Trial courts retain the inherent authority 'to do all things that are reasonably necessary for the proper administration of justice.' " *Red Valve, Inc. v. Titan Valve, Inc.*, 2019 NCBC LEXIS 57, at *39 (N.C. Super. Ct. Sept. 3, 2019) (quoting *Beard v. N.C. State Bar*, 320 N.C. 126, 129 (1987)), *aff'd*, 376 N.C. 798 (2021). "The power to sanction disobedient parties, even to the point of dismissing their actions or striking their defenses, is longstanding and inherent." *Id.* (cleaned up). "The imposition of sanctions is left to the sound discretion of the trial judge and 'will not be overturned absent a showing of abuse of discretion.' " *Id.* at *41 (quoting *Cloer v. Smith*, 132 N.C. App. 569, 573 (1999)).

42. Plaintiffs first argue that the Court should impose sanctions based on WW's and Beth Vannoy's alleged misrepresentations that WW was not aware that WW was a franchise system before retaining Manning Fulton.[49] After careful review of the

---

[49] (Pls.' Crime-Fraud Br. 24.) These representations include (i) Beth Vannoy's testimony that prior to her first communication with Taylor and Sandra M. Clark ("Clark"), another attorney at Manning Fulton, on 30 June 2011, she "had not formed an opinion that [WW] was subject to franchise laws[,]" (Dep. Anna Elizabeth Vannoy, dated Apr. 19, 2018, at 197:25–98:4 [hereinafter "B. Vannoy Dep."], ECF No. 869.1); (ii) Beth Vannoy's testimony that WW did not understand it was subject to franchise laws before receiving "the advice of our attorney [i.e., Manning Fulton]" and after "receiv[ing] the comments back from the registration states[,]" (B. Vannoy Dep. 226:9–24); (iii) the testimony of Blair Ingle, a former WW president and a witness now hostile to WW, that WW had not decided to "convert" to a franchise system as of 4 April 2011, (Resp. Beth Vannoy 2018 Crime-Fraud Mot. Ex. C Dep. Howard Blair Ingle, dated Nov. 29, 2017, at 293:19–94:7, 315:3–16:20 [hereinafter "Ingle Dep."], ECF No. 483.4), a statement Beth Vannoy repeated in her Second Affidavit, (Second Aff. Anna Elizabeth Vannoy, dated Feb. 25, 2019, at ¶ 11 [hereinafter "B. Vannoy Second Aff."], ECF No. 702.6 (sealed)); (iv) WW's interrogatory answer stating that "Window World did not understand or believe itself to be a franchisor prior to September 13, 2011," (Pls.' Compel Br. Ex. 35 Defs.' Am. and Suppl. Resps. Pls.' Sixth Req. Produc. Docs. and Am. and Suppl. Resps. First Set Reqs. Admis. 46 [hereinafter "WW Am. and Suppl. Resps."], ECF No. 813.36); and (v) representations by counsel for Beth Vannoy and WW at the Hearing that WW learned it was subject to franchise laws between its retention of Taylor on 30 June 2011 and the WW board meeting on 9 August 2011 at which Beth Vannoy represented that "our franchises do not comply[,]" (Pls.' 2018 Crime-Fraud Br. Ex. S at WW-0092898, ECF No. 447.20 (sealed);

relevant evidence, the Court cannot conclude that sanctions are appropriate on this basis. Although Plaintiffs have offered substantial evidence that WW and Beth Vannoy were extensively engaged in franchise-related discussions and evaluation prior to WW's retention of Manning Fulton on 30 June 2011, the Court finds that reasonable minds may differ as to the conclusions to be drawn from that evidence. While the evidence could certainly support a factfinder's conclusion that WW knew it operated a franchise system no later than May 2010—based on, for example, Beth Vannoy's extensive franchise-related work for WW, the Board's discussion of franchise-related matters,[50] and WW's payment for an FDD-required audit, all before June 2011[51]—this and other evidence is also susceptible to the conclusion that WW was simply preparing for the day it made a business decision to "convert" to a franchise system and comply with its attendant FDD and related legal requirements.[52] While the Court is skeptical of this latter explanation for WW and Beth Vannoy's conduct based on the evidence of record, the Court is not prepared to find that WW knew as a matter of fact, pre-trial, that it was subject to state and

---

Apr. 21, 2022 Hr'g Tr. 75:15–24, ECF No. 922). Plaintiffs renew these assertions in their recent supplemental brief concerning WW's Waiver Documents. (*See* Pls.' Waiver Docs. Br. 5–9.)

[50] (Pls.' Crime-Fraud Br. Exs. 26–33, ECF Nos. 808.26–.33.)

[51] (Pls.' Crime-Fraud Br. Exs. 21–22, ECF No. 808.21–.22.)

[52] (*See* WW Crime-Fraud Resp. 13–14; Ingle Dep. 135:21–36:17, 293:19–94:7, 315:3–10 (stating that Ms. Vannoy was tasked with looking into franchising from a business perspective); WW Am. and Suppl. Resps. 9.) Defendants renew these assertions in their supplemental response brief concerning the Waiver Documents, stating that "[t]he record does not show that Window World *knew* it was subject to franchising laws." (WW Waiver Docs. Resp. 2.)

federal franchise laws prior to the retention of Manning Fulton on 30 June 2011. As a result, the Court will deny Plaintiffs' Renewed Crime-Fraud Motion to the extent it seeks sanctions on this ground but may revisit this issue upon the presentation of new evidence, including at trial.

43. The Court reaches a different conclusion, however, concerning Plaintiffs' request that sanctions be entered based on Beth Vannoy's alleged misrepresentations under oath and WW's subsequent reliance on those representations in its arguments to the Court.[53] Based on its careful and thorough review of the evidentiary record, and giving full consideration to all the arguments advanced by all interested parties, the Court concludes that WW has offered untruthful testimony from Beth Vannoy that cannot be reconciled with the contemporaneous evidence of record and that WW should be sanctioned as a result.

44. First, Beth Vannoy testified that she did not prepare an FDD, but rather "provided business information in order for [Taylor's] firm to put together the FDD."[54]

---

[53] Defendants suggest that because this testimony by Beth Vannoy was given in 2018, well after Beth Vannoy's work in 2010 and 2011 for WW, and before many of the documents Plaintiffs rely on for their Renewed Crime-Fraud Motion were produced, she should not be expected to recall the legal work and advice that she provided many years before. (*See* WW *Ex Parte* Test. Reply 2–3.) Given the significance of these issues to this litigation and Beth Vannoy's repeated assertions that she did not provide franchise-related legal work even after the production of the evidence discussed at length above, the Court finds Defendants' contentions unpersuasive.

[54] (B. Vannoy Dep. 89:6–7.) Later in her deposition, Ms. Vannoy testified as follows:

> Q. Did you – at some time during that time period – now, I'm talking about beginning of July 2010 through fall of 2011 –
>
> A. Okay.
>
> Q. – did you try to draft an FDD yourself?

She also testified that the documents she created and titled "Franchise Disclosure Document" were "working document[s]" that were used only for gathering research and business information.[55]

45.    This testimony cannot be reconciled with the contemporaneous documentary record.  On 17 May 2010, thirteen months before Taylor and Manning

---

A. Well, that's – that's the information that I collected in order to go meet with counsel.

Q. Okay.  And I guess my question is, did you try to prepare an FDD yourself and then realize, you know, I really need to go see an expert?

A. No.

(B. Vannoy Dep. 204:19–05:4.)  But during the same deposition, Ms. Vannoy provided the following additional testimony:

Q: Okay.  Is it your testimony that you did not start working on the – any version of the FDD until after you had talked to Mr. Taylor?

. . .

A: No.

. . .

Q. Okay.  So when did you first start gathering information for the FDD?

. . .

A. I started gathering information based on what I had learned would go into the FDD, in preparation to consult with our lawyer.

(B. Vannoy Dep. 124:10–23.)

[55] (B. Vannoy Second Aff. ¶¶ 10–11.)  Beth and Jay Vannoy reprise this argument in their supplemental response brief concerning the Waiver Documents, stating that Beth Vannoy was only gathering information for an FDD in preparation for an eventual change in business model and that the Waiver Documents are consistent with that interpretation.  (Vannoy Waiver Docs. Resp. 5–8.)

Fulton were retained and while she was still an attorney at Vannoy Colvard, Beth Vannoy created a 29-page document entitled "Franchise Disclosure Document" and billed WW for a total of 12.4 hours of work that she initially described in the Billing Records as "[b]egin drafting Franchise Disclosure Document."[56] Once she became in-house counsel at WW, she created five additional documents between June 2010 and June 2011, ranging from 45 to 86 pages long, that she titled "Franchise Disclosure Document."[57] The 86-page document was last in time and sent to Taylor with the saved title "Franchise Disclosure Document (USE THIS ONE).docx."[58] She described these documents in contemporaneous emails to other WW employees as "my draft of the Franchise Disclosure Document,"[59] "our Franchise Disclosure Document,"[60] and "my document."[61] Only at her first deposition in this case—when much of the

---

[56] (Pls.' Statement Regarding Vannoy Colvard Billing Rs. Ex. A at VCLAW0001765, 67 [hereinafter "June 17 Billing Records"], ECF No. 893.1 (sealed); Pls.' Crime-Fraud Br. Ex. 11, ECF No. 808.11.) The metadata for the first FDD lists 1 June 2010, (Pls.' Crime-Fraud Br. 9, n.8), but the Billing Records include a billing entry for Beth Vannoy on 17 May 2010 that states "Begin drafting Franchise Disclosure Document[,]" (*see* June 17 Billing Records at VCLAW0001765).

[57] (Pls.' Crime-Fraud Br. Exs. 12–14, 16.) In particular, these documents produced by WW include: two documents dated 20 July 2010, one of which was 46 pages and the other of which was 61 pages, (Pls.' Crime-Fraud Br. Ex. 12); a 45-page document dated 10 March 2011, (Pls.' Crime-Fraud Br. Ex. 13); an 86-page document dated 19 April 2011, (Pls.' Crime-Fraud Br. Ex. 14); and an 86-page document dated 27 July 2011 sent by email to Manning Fulton, (Pls.' Crime-Fraud Br. Ex. 16).

[58] (Pls.' Crime-Fraud Br. Ex. 15.) Large sections of this FDD document were substantially the same as the FDD that Taylor ultimately filed for WW in October 2011. (*Compare* Pls.' Crime-Fraud Br. Ex. 16, *with* WW Compel Resp. Ex. Q, ECF No. 827.18 (sealed).)

[59] (Pls.' Crime-Fraud Br. Ex. 35.)

[60] (Pls.' Crime-Fraud Br. Exs. 37–38.)

[61] (Pls.' Crime-Fraud Br. Ex. 38.)

information on which Plaintiffs rely was being withheld by WW on privilege grounds—did Beth Vannoy first suggest that she did not prepare an FDD for WW and instead had only collected information for outside franchise counsel's eventual use.

46. The Court finds this testimony and her similar testimony in her second affidavit to be untruthful. Not only do her contemporaneous writings and Defendants' billing records show that she was preparing a franchise disclosure document for WW at the time, but Defendants have not offered any contemporaneous evidence reflecting that her FDD document was intended for use by outside counsel prior to June 2011. Nor have Defendants offered any evidence suggesting Beth Vannoy's contemporaneous belief—or that Beth Vannoy advised anyone, orally or in writing at any time—that the FDD she was preparing was simply a vehicle to collect information for not-yet-retained franchise counsel, as she contends in this litigation.[62] Considering the evidence of record showing that Beth Vannoy prepared an FDD for WW's use and the absence of evidentiary support for her deposition statement to the contrary, the Court finds that Ms. Vannoy's testimony concerning her preparation of an FDD for WW was untruthful.

47. Beth Vannoy's testimony that she did not provide franchise-related legal advice to WW while at Vannoy Colvard or as in-house counsel before retaining

---

[62] (*See, e.g.*, Pls.' Crime-Fraud Br. Exs. 35, 37–38, ECF Nos. 808.35, .37, .38 (sealed).)

Manning Fulton is likewise at odds with the contemporaneous evidentiary record.[63] Indeed, the Vannoy Colvard Billing Records show that as an attorney at the firm, she billed WW for approximately 36 hours of legal work between 12 December 2008 and 1 June 2010 for franchise-related research and other work, including preparing licensing agreements for WW in 2008, meeting with a WW store owner who claimed WW was violating franchise laws in May 2010, and preparing an FDD in May 2010.[64] Contemporaneous emails likewise show that she continued providing franchise-related legal advice to WW as the company's in-house counsel in 2010 and 2011 specifically related to FDD compliance requirements, including through her

---

[63] (*See, e.g.*, B. Vannoy Dep. 35:25–36:8 ("Q. Okay. Am I correct in understanding that your testimony, when you were at the Vannoy law firm, that you did not provide advice, drafting documents or anything else for Window World relating to franchise law? . . . A. Correct."), 82:24–83:4 ("Q. How did you provide or provide for franchise law advice to Window World prior to retaining Mr. Taylor? . . . A. I didn't.").) Beth Vannoy further testified by affidavit that she intended to seek advice from a franchise attorney if WW decided to "convert" to a franchise system but that she did not provide advice to WW concerning franchise law. (*See* B. Vannoy Second Aff. ¶¶ 7 ("As of 2010–2011 I had little knowledge or experience in franchise law, so in my view advising WW on franchise law required outside counsel."), 9 ("[I]t was directed toward getting information that WW would give to lawyers to help those outside attorneys give WW legal advice."); Pls.' Crime-Fraud Br. Ex. 35.)

[64] (June 17 Billing Records at VCLAW0001691–92, 1761–67.) In particular, Beth Vannoy's work included discussing "franchise regulations with Jay Vannoy[,]" (June 17 Billing Records at VCLAW0001691), research on "Federal Trade Commission regulations of franchises[,]" (June 17 Billing Records at VCLAW0001692), research "state franchise guidelines for ME, MD, MN, NE, NY, NC, ND, OK, OR, RI, SC, SD, VA, WA, and WI[,]" (June 17 Billing Records at VCLAW0001761), "[a]naly[sis] [of] Federal Franchise Registration and Disclosure Guidelines and 16 C.F.R. Part 436, and Compliance Guide in preparation to discuss requirements with WW[,]" (June 17 Billing Records at VCLAW0001762), "[o]utline disclosure requirements under Federal Franchise Act in preparation for meeting with [WW]," (June 17 Billing Records at VCLAW0001763), and "[d]raft emails to Mark [Bumgarner], Dana [Deem], and Sean [Gallaher] providing instructions for compiling information for Franchise Disclosure Document[,]" (June 17 Billing Records at VCLAW0001765).

communications with WW employees gathering information to assist her preparation of WW's draft FDD.[65]

48. Defendants seek to explain this evidence by suggesting that Beth Vannoy provided legal *services* to WW but not legal *advice*.[66] The Court finds that this is a distinction without a difference.[67] The fact remains that Beth Vannoy billed WW for franchise-related legal research and the preparation of an FDD at Vannoy Colvard and, when she moved in-house, she continued her efforts to prepare an FDD and offered the WW Board advice on franchise law and compliance matters.[68] Indeed, Taylor represented to state regulators, with Beth Vannoy's approval, that Ms. Vannoy had been hired as WW's general counsel before Manning Fulton's retention

---

[65] In particular, Beth Vannoy sent emails requesting information for inclusion in WW's FDD to Mark Bumgarner, (Pls.' Waiver Docs. Br. Exs. A3, A10, A12–A13, A17, A20, A22–A24, ECF Nos. 912.4, .11, .13–.14, .18, .21, .23–.25; Pls.' Compel Br. Exs. 2–4, ECF Nos. 813.3–.5), Dana Deem, (Pls.' Waiver Docs. Br. Exs. A1, A4–A5, A14–A16, ECF Nos. 912.2 (sealed), .5, .6 (sealed), .15 (sealed), .16, .17 (sealed); Pls.' Compel Br. Ex. 58–59, ECF Nos. 813.59 (sealed), .60), Sean Gallagher, (Pls.' Waiver Docs. Br. Exs. A2, A7, A11, ECF Nos. 912.3, .8, .12; Pls.' Compel Br. Ex. 56, ECF No. 813.57), Bridgett Pratt, (Pls.' Crime-Fraud Br. Ex. 38; Pls.' Compel Br. Exs. 55, 57, 62, ECF Nos. 813.56, .58, .63 (sealed)), and Jan Kilby, (Pls.' Waiver Docs. Br. Exs. A6, A9, ECF Nos. 912.7, .10.)

[66] (WW Compel Resp. 16; Apr. 21, 2022 Hr'g Tr. 268:8–70:9.) Defendants previously advanced this argument in their response to Plaintiffs' 2018 Crime-Fraud Motion, (Defs.' Resp. Pls.' 2018 Crime-Fraud Mot. 10, ECF Nos. 481 (sealed), 505 (redacted)), and Beth Vannoy also made this argument in her Second Affidavit, (B. Vannoy Second Aff. ¶¶ 8, 12).

[67] While the Court has not found a useful definition of the term "legal advice," Black's Law Dictionary defines the "practice of law" as encompassing "a broad range of services such as . . . preparing legal opinions on various points of law . . . and advising clients on legal questions." *Practice of Law*, *Black's Law Dictionary* (11th ed. 2019). "Advice of counsel" is defined in Black's Law Dictionary as "[t]he guidance given by lawyers to their clients." *Advice of Counsel*, *Black's Law Dictionary* (11th ed. 2019).

[68] (*See* Pls.' Crime-Fraud Br. Exs. 27, 29–33, ECF Nos. 808.27, .29–.33.)

and was "empowered . . . to lead [WW's franchise law] compliance activities[,]"[69] and that Manning Fulton had only been retained after she had "made the initial determination" that WW was a franchisor in its relationships with Plaintiffs.[70] To contend, as she does, that she did not provide franchise-related legal advice in the face of this evidence is simply not credible.

49. Finally, as suggested in the August 2019 Order, *see Window World 2019*, 2019 NCBC LEXIS 54, at *56 n.39, the evidence establishes that Beth Vannoy misrepresented her actions in revising WW's licensing agreements. In particular, she testified that she did not "try to revise" these licensing agreements "so they would comply with franchise laws[.]"[71] This testimony is directly contradicted by an email she sent in January 2011 stating that she "made substantive changes" to the licensing agreements "with the requirements of the Franchise Disclosure Document in mind" and that she would begin "issuing renewal agreements" once finalized.[72]

50. Based on the preponderance of the evidence, the Court finds that Beth Vannoy has testified falsely in these actions as set forth above and concludes, in the exercise of its discretion, that sanctions should be imposed on WW for this misconduct.

---

[69] (*See* Pls.' Crime-Fraud Br. Exs. 46–47, 49, ECF Nos. 808.46–.47, .49.)

[70] (Pls.' Crime-Fraud Br. Ex. 49.)

[71] (B. Vannoy Dep. 205:5–12.)

[72] (Pls.' Crime-Fraud Br. Ex. 19, ECF No. 808.19 (sealed).)

51. Turning then to specific sanctions, Plaintiffs request sanctions up to and including striking WW's pleadings and entering default judgment for Plaintiffs.[73] In the alternative, Plaintiffs request lesser sanctions that include (i) a declaration by the Court that the licensing agreements signed by Plaintiffs were fraudulently induced and void; (ii) striking WW's counterclaims; (iii) requiring WW to pay into the Court the rebate payments earned from their customers' sales beginning in 2018 when the misconduct began; and/or (iv) an award of post-remand attorneys' fees.[74]

52. "When imposing sanctions, the trial court has discretion to pursue a wide range of actions both for the purpose of leveling the evidentiary playing field and for sanctioning the improper conduct." *Ford v. Jurgens* (*Ford II*), 2022 NCBC LEXIS 13, at *17 (N.C. Super. Ct. Feb. 16, 2022) (internal quotation marks omitted) (quoting *Clark v. Alan Vester Auto Grp., Inc.*, 2009 NCBC LEXIS 13, at *27 (N.C. Super. Ct. July 17, 2009)). In particular, "[t]he Court is free 'to fashion an appropriate sanction for conduct which abuses the judicial process.' " *Id.* (quoting *Clark*, 2009 NCBC LEXIS 13, at *27).

53. "When sanctioning a party under its inherent authority, the court must weigh the circumstances of each case and choose a sanction that, in the court's judgment, 'properly takes into account the severity of the party's disobedience.' " *Out of the Box Devs., LLC v. LogicBit Corp.*, 2014 NCBC LEXIS 7, at *10 (N.C. Super. Ct. Mar. 20, 2014) (quoting *Patterson v. Sweatt*, 146 N.C. App. 351, 357 (2001)). "The

---

[73] (Pls.' Crime-Fraud Br. 21.)

[74] (Apr. 21, 2022 Hr'g Tr. 60:8–25.)

Court has a duty to protect the integrity of the legal process . . . [by] address[ing] false statements made to the Court, both to ensure that the party making the false statement receives no advantage from it and to deter similar conduct by other parties in the future." *Kixsports, LLC v. Munn*, 2019 NCBC LEXIS 62, at \*26 (N.C. Super. Ct. Sept. 30, 2019). "[S]erious sanctions, including the dismissal of an action, 'are appropriate when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process.'" *Red Valve*, 2019 NCBC LEXIS 57, at \*43 (quoting *Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013)). Nevertheless, "striking a party's answer is a severe sanction which should only be imposed where the trial court has considered less severe sanctions and found them to be inappropriate." *Few v. Hammack Enters., Inc.*, 132 N.C. App. 291, 299 (1999).

54. After careful consideration, the Court declines to exercise its discretion to grant Plaintiffs' request to strike WW's pleadings and enter default for Plaintiffs. WW's misconduct is primarily related to Plaintiffs' claims regarding the licensing agreements and WW's non-compliance with franchise law, and that misconduct does not bear on the other claims and counterclaims in these cases. The Court concludes, therefore, that striking WW's pleadings would be "too blunt a force to use[,]" *Ford II*, 2022 NCBC LEXIS 13, at \*22, in these circumstances. In addition, Plaintiffs have not shown either a sufficient connection between WW's misconduct and Plaintiffs' rebate claims or the dollar amount of those rebate claims to justify sanctions in the form of ordered rebates.

55. Rather, the Court finds that WW's misconduct directly frustrated Plaintiffs' ability to discover information concerning WW's knowledge and conduct with respect to its obligations under franchise law during the relevant time period—information that is central to certain of Plaintiffs' claims—which resulted in a substantial delay in the prosecution of this litigation and caused Plaintiffs to incur substantial and unnecessary attorneys' fees and costs. As such, the Court concludes, pursuant to its inherent authority, in the exercise of its discretion, and after considering the imposition of lesser sanctions, that sanctions should be imposed against WW as follows:

> a. The Court will instruct the jury at trial that the jury shall accept as true without further proof that Beth Vannoy drafted an FDD prior to WW's retention of Manning Fulton on 30 June 2011 and provided legal advice on franchise-related matters to WW prior to that time;
>
> b. The Court will further instruct the jury at trial that in deciding whether to believe the testimony of Beth Vannoy, the jury may consider Beth Vannoy's statements that she did not draft an FDD prior to WW's retention of Manning Fulton on 30 June 2011 and that she did not provide legal advice on franchise-related matters to WW prior to that time;[75] and

---

[75] Courts have imposed these kinds of adverse inference jury instructions in similar circumstances. *See, e.g.*, *Miller v. Pilgrim's Pride Corp.*, No. 5:05CV00064, 2008 U.S. Dist. LEXIS 3305, at *24 (W.D. Va. Jan. 16, 2008) (discussing factors a court may consider when determining whether an adverse inference jury instruction is warranted).

c. The Court will also award Plaintiffs their attorneys' fees and costs incurred in advancing the Renewed Crime-Fraud Motion, addressing the post-Hearing Billing Records issue, defending against the Motion for *Ex Parte* Testimony, and in otherwise establishing that Beth Vannoy falsely testified that she did not draft an FDD prior to WW's retention of Manning Fulton on 30 June 2011 and that she did not provide legal advice on franchise-related matters to WW prior to that time.

D.    Motion to Compel

56.    Through the Motion to Compel, Plaintiffs ask that the Court conduct an *in camera* review and compel the production of fifty-two documents that Plaintiffs allege WW has wrongfully withheld or redacted for privilege.[76]

57.    WW has recently waived its privilege claims to twenty-three of the remaining twenty-five documents identified as "Privilege Claims related to Pre-October 2011 Franchise Issues" on Exhibit A to Plaintiffs' Motion to Compel. These twenty-three documents were generated before Manning Fulton's retention on 30 June 2011.[77] WW additionally agreed to unredact the franchise-related redactions in the five Vannoy Colvard Billing Records relating to work performed before 30 June

---

[76] (*See* Pls.' Compel Br. 10, 19, 22, 25.) As noted above, WW released its privilege claim as to WW-00170946 prior to the Hearing on the Renewed Motions, (*see* Defs.' Compel Resp. 11 n.4), so while the Motion to Compel lists fifty-three documents, there were only fifty-two documents in dispute at the time of the Hearing.

[77] (*See* Defs.' *Ex Parte* Test. Reply 11; Pls.' Mot. Compel Ex. A.) The two documents to which Defendants have not released their privilege claims are identified as WW00171293 and WW00171709 on Exhibit A to Plaintiffs' Motion to Compel. (*See* Scheduling Order 3 n.2.)

2011;[78] however, Plaintiffs challenge WW's privilege redactions in one of the five documents produced, originally filed as Exhibit 22 to Plaintiffs' Motion to Compel ("Exhibit 22").[79] Thus, the remaining documents subject to the Motion to Compel fall into four separate categories: (i) two franchise-related documents created after 30 June 2011 ("Category One"); (ii) seven documents produced by Manning Fulton that were created after 30 June 2011 and that WW has withheld or redacted on the basis of work-product immunity or attorney-client privilege ("Category Two"); (iii) fifteen documents produced by WW or third parties that WW has withheld or redacted on the basis of privilege ("Category Three"); and (iv) the portions of Exhibit 22 in the June 17 Production relating to work performed after 30 June 2011.[80]

58.    "The primary purpose of the discovery rules is to facilitate the disclosure prior to trial of any *unprivileged* information that is relevant and material to the lawsuit so as to permit the narrowing and sharpening of the basic issues and facts that will require trial." *Friday Invs., LLC*, 370 N.C. at 237–38 (quoting *Bumgarner*

---

[78] (*See* Defs.' *Ex Parte* Test. Reply 11; Pls.' Mot. Compel Ex. A.)  Based on the record before the Court, and considering Defendants' waiver of privilege with respect to these twenty-eight documents after months of motions practice concerning their production, the Court concludes, in the exercise of its discretion, that Defendants' explanation for their waiver—a purported interest in moving the litigation forward—does not constitute a substantial justification under Rule 37(a)(4) and under Rule 37(d) for maintaining their opposition to Plaintiffs' Motion to Compel in these circumstances.  Accordingly, the Court concludes, in the exercise of its discretion, that, under Rule 37 and pursuant to the Court's inherent authority, Plaintiffs are entitled to an award of their reasonable expenses, including attorneys' fees, incurred in advancing the Motion to Compel.

[79] (*See* Pls.' Statement Regarding Privilege Claims Vannoy Colvard Billing Rs. 4–9; Pls.' Compel Br. Ex. 22; June 17 Billing Records.)

[80] (Pls.' Compel Br. 10, 17, 21, 22, 25; Pls.' Statement Regarding Privilege Claims Vannoy Colvard Billing Rs. 4–9.)

*v. Reneau*, 332 N.C. 624, 628 (1992)). Pursuant to Rule 26 of the North Carolina Rules of Civil Procedure (the "Rule(s)"), parties may "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action[.]" N.C. R. Civ. P. 26(b)(1). Under Rule 37, a party may seek to compel discovery if the opposing party has failed to respond to discovery or provided responses that are "evasive or incomplete[.]" N.C. R. Civ. P. 37(a)(2)–(3).

59. "In considering a motion to compel discovery, '[t]he party resisting discovery bears the burden of showing why the motion to compel should not be granted.'" *Duke Energy Carolinas, LLC v. AG Ins. SA/NV*, 2019 NCBC LEXIS 75, at *5 (N.C. Super. Ct. Nov. 22, 2019) (alteration in original) (quoting *Nat'l Fin. Partners Corp. v. Ray*, 2014 NCBC LEXIS 50, at *26 (N.C. Super. Ct. Oct. 13, 2014)). "Specifically, the party seeking protection from the court from responding to discovery must make a particularized showing of why discovery should be denied, and conclusory or generalized statements fail to satisfy this burden as a matter of law." *Nat'l Fin. Partners Corp.*, 2014 NCBC LEXIS 50, at *26 (quoting *Smithfield Bus. Park, LLC v. SLR Int'l Corp.*, No. 5:12-CV-282-F, 2014 U.S. Dist. LEXIS 110535, at *7 (E.D.N.C. Aug. 11, 2014)). "The decision whether to grant or deny a motion to compel discovery is within the sound discretion of the trial court." *Transatl. Healthcare, LLC v. Alpha Constr. of the Triad, Inc.*, 2017 NCBC LEXIS 21, at *37 (N.C. Super. Ct. Mar. 9, 2017).

60. The Court has conducted an *in camera* review of the remaining twenty-five documents at issue on the Motion to Compel and thus turns to Plaintiffs' specific challenges.

1. <u>Category One: Two Documents Related to Franchise Law and WW's FDD</u>

61. The Category One documents, WW00171293 and WW00171709, consist of two emails that Beth Vannoy sent to request information from WW employees for WW's FDD after 30 June 2011.[81] WW contends that Beth Vannoy was acting as both a lawyer—performing a legal service by gathering information for an FDD—and as a client—preparing information to meet with counsel—and that these communications are privileged on both grounds.[82] Plaintiffs disagree and contend that the documents are not privileged regardless of whether Beth Vannoy acted in either role.[83]

62. Applying attorney-client privilege in the corporate context "presents special problems." *Technetics Grp. Daytona, Inc. v. N2 Biomedical, LLC*, 2018 NCBC LEXIS 116, at *7 (N.C. Super. Ct. Nov. 8, 2018) (quoting *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985)). A "company and its counsel may not avail themselves of the protection afforded by the attorney-client privilege if the attorney was not acting as a legal advisor when the communication was made." *Evans v. United Servs. Auto. Ass'n*, 142 N.C. App. 18, 32 (2001). When a privilege dispute involves in-house counsel, this Court has noted that:

> North Carolina courts apply the protection of the attorney-client privilege to in-house counsel in the same way that it is applied to other attorneys. A company and its in-house counsel may, however, only benefit from the protection of the attorney-client privilege if the attorney is functioning as a legal advisor when the communication occurs. A communication will not be deemed privileged merely because an in-

---

[81] (*See* Pls.' Mot. Compel Ex. A.)

[82] (WW Compel Resp. 16.)

[83] (Pls.' Compel Br. 12–13.)

house attorney was copied on the communication or forwarded a copy of a document. When the in-house counsel's legal advice is merely incidental to business advice, the privilege does not apply.

*Morris v. Scenera Rsch., LLC*, 2011 NCBC LEXIS 34, at *15 (N.C. Super. Ct. Aug. 26, 2011) (cleaned up).

63. In addition to acting as a legal advisor, however, in-house counsel may assume the role of client as the designated representative for the company when communicating with outside counsel. "In fact, in-house counsel may be the corporate employee who is the most well-suited to understand, digest, and apply outside counsel's legal advice." *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1074 (N.D. Cal. 2002), *R. & R. adopted by* 241 F. Supp. 2d 1065, 1068 (2002). "Thus, communications between in-house counsel seeking legal advice for the corporate client and outside counsel giving legal advice as an attorney are covered by the attorney-client privilege." *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1167 (D.S.C. 1974); *see, e.g.*, *Buckley LLP*, 2020 NCBC LEXIS 136, *18–20 (concluding that some, but not all, in-house counsel communications were privileged).

64. The Court first examines Beth Vannoy's role as a lawyer in connection with these communications. Beth Vannoy claims that she did not provide legal advice concerning these matters—an assertion the Court has found to be untruthful. WW maintains that her communications are protected by attorney-client privilege because she provided legal services, not legal advice, when she gathered information that would be necessary to draft an FDD.[84] The Court has found this contention to

---

[84] (WW Compel Resp. 16.)

advance a distinction without a difference. Nevertheless, the Court concludes that these communications are protected by attorney-client privilege because they reflect Beth Vannoy's legal advice when she collected information from WW employees to include in the FDD she drafted.

65. The Court reaches the same conclusion to the extent Beth Vannoy was acting as a client. The challenged communications were sent after WW retained Manning Fulton, and WW has shown that Beth Vannoy generated these documents to provide information to Manning Fulton. As a result, the Court will deny Plaintiffs' motion to compel the production of these documents.

### 2. Category Two: Seven Manning Fulton Documents

66. The second category of documents that Plaintiffs seek to compel are seven documents produced by Manning Fulton that were created after 30 June 2011 and that WW has withheld or partially redacted on grounds that they are protected from disclosure by both the attorney-client privilege and the work-product doctrine.

67. Five of these documents—RWT-00006720.002, RWT-00002439, RWT-00002321, RWT-00002070, and RWT-00002002[85]—involve communications between Manning Fulton attorneys and Beth Vannoy that reflect the seeking and providing of legal advice concerning franchise law compliance and WW's FDD and are therefore privileged.

68. The two others—RWT-00006720.003 and RWT-00003811—are documents that Taylor prepared in connection with providing legal advice to WW concerning

[85] (*See* Pls.' Mot. Compel. Ex. A.)

franchise law compliance and WW's FDD. The first identifies licensees in franchise registration states and contains Taylor's notes concerning potential statute of limitations issues. The second is an outline Manning Fulton prepared to track the firm's progress and communications with Beth Vannoy concerning WW's FDD and contains handwritten notes concerning needed information regarding several state franchise registration statutes.[86] It does not appear that either of these documents were shared with WW. Nevertheless, WW argues that each was prepared in anticipation of litigation, and thus constitute protected work product, because they were created to facilitate Taylor's negotiations with various state regulators "to deal with compliance issues, register [WW's] franchise offering[,] and to avoid formal litigation."[87]

69.  "[M]ost courts hold 'that work product prepared in anticipation of earlier litigation retains its protection in later disputes.' " *Lawrence v. UMLIC-Five Corp.*, 2007 NCBC LEXIS 30, at \*13 (N.C. Super. Ct. Sept. 14, 2007) (quoting *Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81, 86 (W.D.N.C. 2000)); *accord FTC v. Grolier, Inc.*, 462 U.S. 19, 25 (1983) (holding that the work-product doctrine protects "materials prepared for *any* litigation or trial so long as they were prepared by or for a party to the subsequent litigation[ ]"). While state regulators never actually initiated litigation against WW, the Court agrees that litigation was reasonably

---

[86] (*See* Aff. Ritchie W. Taylor, dated Mar. 2 2022., at ¶¶ 8–9 [hereinafter "Taylor Aff."], ECF No. 827.14.)

[87] (*See* Taylor Aff. ¶ 4.)

anticipated at the time the documents were prepared because WW intended to inform state regulators that it had not complied with state franchise laws. The Court thus concludes that these two Category Two documents are protected work product.[88]

70. The Court also concludes that Plaintiffs have failed to demonstrate a "substantial need" for the documents or that they would suffer "undue hardship" if they are forced to "obtain [a] substantial equivalent of the materials by other means." *Wachovia Bank, N.A. v. Clean River Corp.*, 178 N.C. App. 528, 532–33 (2006). *Compare Kelley v. Charlotte Radiology, P.A.*, 2019 NCBC LEXIS 84, at *47–48 (N.C. Super. Ct. May 15, 2019) (holding that plaintiff did not demonstrate a substantial need where the information contained within the work product was still discoverable through deposition), *with Isom v. Bank of Am., N.A.*, 177 N.C. App. 406, 414 (2006) (finding a substantial need when plaintiff's cause of action and theory of the case was grounded in the contents of a document possessed solely by defendant). Here, the Court has afforded Plaintiffs the opportunity to conduct further depositions through the August 2019 Order, which Plaintiffs may use to further inquire into WW's

---

[88] The Court further concludes, based on its *in camera* review, that RWT-00006720.002, RWT-00002441, MFSLAW-00006528, MFSLAW-00006531, and MFSLAW-00006534 are additionally protected from disclosure by the attorney-client privilege. Although Plaintiffs argue that WW's privilege redactions in the latter three documents fail because WW's privilege log descriptions do not sufficiently identify that they were communicated to WW, (*see* Pls.' Compel Br. 25), Taylor confirms in his affidavit that these three documents were communicated to Beth Vannoy in the course of rendering legal advice and he identifies the specific emails by which the documents were sent, (*see* Taylor Aff. ¶ 6).

knowledge of its franchise status.[89]  As such, the Court concludes that these two Category Two documents are protected from disclosure and need not be produced.

71.  Accordingly, based on the above, the Court will deny Plaintiffs' Motion to Compel as to the seven Category Two documents.

### 3. Category Three: Fifteen Miscellaneous Documents

72.  The Category Three documents that Plaintiffs seek to compel include various draft documents and communications involving Beth Vannoy and other members of WW's leadership team.  Except as noted below, the Court concludes that WW has properly withheld or redacted each document based on privilege.

73.  Both WW00518219 and WW00518220 are draft agreements with a third party.[90]  Plaintiffs argue that, because neither the documents themselves nor WW's privilege logs identify an author or a recipient, no privilege can attach without evidence that they "constitute . . . communication[s] between client and counsel either giving or seeking legal advice."[91]  WW contends that they provided Plaintiffs with metadata demonstrating that Beth Vannoy was the author.[92]  In the August 2019 Order, this Court concluded that "the only portions of a draft document subject to disclosure are those that are ultimately disclosed to a third party." *Window World*

---

[89] In the August 2019 Order, the Court ordered that WW make certain WW witnesses available for re-deposition, including Beth Vannoy, as sanctions for WW's discovery misconduct. *See Window World 2019*, 2019 NCBC LEXIS 54, at *99–100.

[90] (*See* Pls.' Mot. Compel Ex. A.)

[91] (Pls.' Compel Br. 28.)

[92] (WW Compel Resp. 29; WW Compel Resp. Ex. C at 10, ECF No. 827.4.)

*2019*, 2019 NCBC LEXIS 54, at \*76. Accordingly, the Court concludes that these documents are not privileged to the extent they were subsequently published to third parties. While WW has failed to offer evidence to suggest that changes were made to either document prior to publication, the Court will order the documents to be produced but allow WW the opportunity to redact the portions that were not ultimately disclosed, if any.

74. MFSLAW-00003508, MFSLAW-00005048, and MFSLAW-00005158 are draft FDD documents containing notes and suggested revisions exchanged between Manning Fulton and Beth Vannoy.[93] These notes communicate advice about the FDD, are therefore privileged, and may be redacted. *See Ford I*, 2021 NCBC LEXIS 89, at \*14 (concluding that "marginal comments and redline edits made by counsel[ ]" were protected by attorney-client privilege).

75. WW-0178466 includes a redacted email from Beth Vannoy transmitting draft documents to WW executives and board members[94] and a partial redaction of board member Jamie McBride's ("McBride") response to that email.[95] The transmittal email from Beth Vannoy contains legal advice and therefore the Court concludes that Beth Vannoy's redacted email and McBride's redacted response are privileged.

---

[93] (Pls.' Compel Br. Exs. 19–21, ECF Nos. 813.20–.22 (sealed); *see* Taylor Aff. ¶ 7 ("It has been my regular practice . . . to embed 'drafting notes' as a way to communicate comments, suggestions, or questions to my client in the footnotes or the body text of written documents prepared or edited by me, such as a [FDD].")

[94] Beth Vannoy's email was identified as Sample Log Document 11 and found to be privileged in the August 2019 Order. *See Window World 2019*, 2019 NCBC LEXIS 54, at \* 108.

[95] (Pls.' Compel Br. Ex. 11, ECF No. 813.12.)

76.    WW-0187207 is privileged legal advice from Beth Vannoy related to potential preferred pricing changes.[96]

77.    WW-0183000 is an email from Beth Vannoy to others at WW relaying an email from Clark conveying legal advice and including a completed FDD as an attachment.[97]  Both emails are privileged and properly redacted.  *See Veolia Water Sols. & Techs. Support v. Siemens Indus., Inc.*, 63 F. Supp. 3d 558, 567 (E.D.N.C. 2014) (recognizing that relaying information from an attorney may be privileged).

78.    The remaining documents, WW-0132128, WW-0144154, BOD_DR_0000128, BOD_DR_0000955, BOD_JM_0000140, BOD_JM_0000670, and BOD_JM_0000683 each include either requests for legal advice by WW employees or legal advice provided by Beth Vannoy or Jay Vannoy.[98]  As such, these communications are privileged.

79.    In sum, the Court concludes that, with the exception of WW00518219 and WW00518220, WW properly withheld or redacted the challenged Category 3 documents on the basis of privilege, and as to the two excepted documents, the Court will permit WW to redact the portions that were not ultimately disclosed, if any.

---

[96] (Pls.' Compel Br. Ex. 13, ECF No. 813.14.)

[97] (Pls.' Compel Br. Ex. 12, ECF No. 813.13.)

[98] (Pls.' Compel Br. Exs. 9–10, 14–18, ECF Nos. 813.10–.11, .15 (sealed), .16–.19.)

4. Category Four: Remaining Redacted Entries in Vannoy Colvard's June 17 Production

80.    After taking into account WW's pre-30 June 2011 privilege waiver, Plaintiffs' objection to WW's redactions to Exhibit 22 in the June 17 Production now concern only those redactions to Vannoy Colvard's billing entries that reflect the firm's legal services incurred after 30 June 2011.[99]   At the Court's direction,[100] Vannoy Colvard provided the Billing Records to the Court *in camera* on 2 August 2022 with a corresponding privilege log.  Based on the Court's *in camera* review, the Court concludes that the billing entries still subject to challenge have been properly redacted as privileged.  Accordingly, Plaintiffs' request to compel production of unredacted versions of the Billing Records created after 30 June 2011 shall be denied.

III.

CONCLUSION

81.    **WHEREFORE**, the Court, in the exercise of its discretion, hereby **ORDERS** as follows:

a. Defendants' Motion for *Ex Parte* Testimony is hereby **DENIED**.

b. Plaintiffs' Renewed Crime-Fraud Motion is hereby **DENIED as moot** with respect to the application of the crime-fraud exception to WW's franchise-related communications before 30 June 2011 and **DENIED**

---

[99] (Pls.' Statement Regarding Privilege Claims Vannoy Colvard Billing Rs. 2.)  Plaintiffs identify all of the challenged billing narratives in Exhibit B to their Statement Regarding Privilege Claims, (Pls. Statement Regarding Privilege Claims Vannoy Colvard Billing Rs. Ex. B at 2, ECF No. 888.3.).

[100] (*See* Order *in Camera* Review Vannoy Colvard Billing Rs.)

with respect to the application of the crime-fraud exception to WW's franchise-related communications thereafter.

c. Plaintiffs' Renewed Crime-Fraud Motion is hereby **GRANTED** with respect to Plaintiffs' request for sanctions, and sanctions shall be entered against Defendants as follows:

  i. The Court will instruct the jury at the trial of this action that the jury shall accept as true without further proof that Beth Vannoy drafted an FDD prior to WW's retention of Manning Fulton on 30 June 2011 and provided legal advice on franchise-related matters to WW prior to that time;

  ii. The Court will further instruct the jury at the trial of this action that in deciding whether to believe the testimony of Beth Vannoy, the jury may consider Beth Vannoy's statements that she did not draft an FDD prior to WW's retention of Manning Fulton on 30 June 2011 and that she did not provide legal advice on franchise-related matters to WW prior to that time;

  iii. The Court will also award Plaintiffs their attorneys' fees and costs incurred in advancing the Renewed Crime-Fraud Motion, addressing the post-Hearing Billing Records issues, defending against the Motion for *Ex Parte* Testimony, and in otherwise establishing that Beth Vannoy falsely testified that she did not draft an FDD prior to WW's retention of Manning Fulton on 30

June 2011 and that she did not provide legal advice on franchise-related matters to WW prior to that time; and

iv. The Court shall address the total amount of fees and expenses to be awarded hereunder by separate order after full briefing and hearing on Plaintiffs' fee application as follows:

1. Plaintiffs shall have through and including twenty (20) days after entry of this Order to file their fee application and any supporting materials;

2. Defendants shall have through and including twenty (20) days after Plaintiffs file their fee application and supporting materials to file any response to Plaintiffs' fee submission;

3. Plaintiffs shall have through and including ten (10) days after Defendants' response to file a reply in support of their fee application; and

4. The Court will determine at a later date whether to convene a hearing on Plaintiffs' anticipated petition for fees and costs.

d. Plaintiffs' Motion to Compel is hereby **GRANTED in part** and Defendants are hereby **ORDERED** to produce documents WW00518219 and WW00518220 to Plaintiffs within ten (10) days of the entry of this order; provided, however, that Defendants shall be permitted to redact

the portions of those documents that were not ultimately disclosed to third parties, if any.

e. Plaintiffs' Motion to Compel is hereby **DENIED as moot** with respect to the Waiver Documents identified above and, except as provided above and herein, Plaintiffs' Motion to Compel is **DENIED**.

    i. Under Rule 37 and the Court's inherent authority, the Court will also award Plaintiffs their attorneys' fees and costs incurred in advancing the Motion to Compel; and

    ii. The Court shall address the total amount of fees and expenses to be awarded hereunder by separate order after full briefing and hearing on Plaintiffs' fee application as follows:

        1. Plaintiffs shall have through and including twenty (20) days after entry of this Order to file their fee application and any supporting materials;

        2. Defendants shall have through and including twenty (20) days after Plaintiffs file their fee application and supporting materials to file any response to Plaintiffs' fee submission;

        3. Plaintiffs shall have through and including ten (10) days after Defendants' response to file a reply in support of their fee application; and

4. The Court will determine at a later date whether to convene a hearing on Plaintiffs' anticipated petition for fees and costs.

**SO ORDERED**, this the 10th day of November, 2022.[101]

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge

---

[101] This Order and Opinion was originally filed under seal on 10 November 2022. This public version of the Order and Opinion was filed on 23 November 2022. To avoid confusion in the event of an appeal, the Court has elected to state the filing date of the public version of the Order and Opinion as 10 November 2022.